UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARIA T. OVIEDO-ALVARENGA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:16-cv-00815-SEB-MJD |
| | ) | |
| CAITO FOODS SERVICE INC., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

This matter is before the Court on Defendant's Motion for Summary Judgment [Dkt. 37],

seeking judgment as a matter of law on Plaintiff Maria Oviedo-Alvarenga's claims of

employment discrimination, harassment, and retaliation. For the following reasons, the

Magistrate Judge recommends that the District Judge **GRANT IN PART** and **DENY IN PART**

Defendant's Motion, permitting Ms. Oviedo's retaliation claim to proceed to trial.

### I.  Legal Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is required where the

movant demonstrates that there is no genuine issue of material fact and that the movant is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence

in the light most favorable to the nonmoving party and must draw all reasonable inferences in the

nonmoving party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).

The Court may not weigh evidence or make credibility determinations on summary judgment.

*O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

## II. Facts for Summary Judgment

### A. Ms. Oviedo's Job at Caito

Plaintiff Maria Oviedo-Alvarenga worked for Defendant Caito as a "human resources generalist" from October 2014 until her termination in July 2015. Ms. Oviedo was assigned to lead human resources efforts over Caito's "FreshLine Division," which processed and prepared fresh produce for consumption. Ms. Oviedo's duties included attending production meetings, obtaining staffing reports, investigating complaints, tracking employee attendance, and obtaining workers from staffing agencies as directed by management. In particular, Ms. Oviedo was expected to keep the FreshLine Division fully staffed during Caito's peak seasons, including during the summer. When Ms. Oviedo began working at Caito, she was assigned an assistant, Amada Munoz, to help with her hiring duties. Munoz dedicated 20 percent of her time to assisting Ms. Oviedo and 80 percent of her time to other duties. [Dkt. 45-5 at 7.]

Ms. Oviedo reported to Dan Gatto, director of human resources, and Carrie Frizzell, vice president of human resources, during the entirety of her employment with Caito. Ms. Oviedo also took direction from Dan Correll, operations director for the FreshLine Division. Correll oversaw six "associates" on the FreshLine Division over whom he had the authority to recommend the initiation of termination proceedings.

### B. Incidents with Correll

Ms. Oviedo and Correll regularly crossed paths at Caito, and Correll frequently engaged in conduct of which Ms. Oviedo did not approve. On three occasions, Correll put his finger close to Ms. Oviedo's chest as part of a "made you look" gesture.[1] As Ms. Oviedo explained at her deposition,

---

[1] A dispute between the parties regarding the use of the word "chest" is emblematic of the unacceptable squabbling that has transpired throughout the briefing of this Motion. Ms. Oviedo's response brief

> So Dan Correll approach me, say—pointing to my chest. He didn't touch my chest, but he pointed to my chest really close. [Correll said,] Maria, you have something there. Look what you have there. So when I turn my head down to see what was it, he put his fingers up to me so he raise—he touch my chin[], and my face went up like that.

[Dkt. 45-1 at 12.]

The first time this happened, Ms. Oviedo said, "Oh, you silly. I thought that what he just—okay. Joking. I didn't like it that much. That was the very first time something like that happen. And I didn't make a big deal about it." [*Id.*] The second time this happened, Ms. Oviedo said, "I don't like those joke." [*Id.* at 13.] The third time this happened, Ms. Oviedo said, "Stop doing that because I don't like those type of joke." [*Id.*] After Ms. Oviedo told Correll to stop, he did not do the finger gesture to Ms. Oviedo again. Ms. Oviedo saw Correll do it on one other occasion, to her female assistant, Munoz, but never saw Correll do the finger gesture to a male employee. Correll admits that he did the finger action "quite frequently with quite a few people in the Fresh Line group," claiming that he did it to both male and female employees as a "tension breaker." [Dkt. 45-6 at 9.]

On approximately two occasions, Correll called Ms. Oviedo and Munoz "assholes." [Dkt. 45-1 at 11.] On one occasion, Correll walked in Ms. Oviedo's office and said, "Hey, assholes. Hey, assholes." [*Id.*] Ms. Oviedo and Munoz ignored Correll, who then wrote "Hey,

---

contains a section heading that states: "Almost Touching Breasts, Then Touching Chin Instead at Least Three Times." [Dkt. 44 at 3.] In reply, Caito complains that this is a "blatant distortion of the record" because "Plaintiff never used the word 'breast' in describing Correll's conduct." [Dkt. 48 at 2.] This is one of the many silly disputes that have caused the briefing to blossom beyond the ordinary three briefs into five briefs, collectively occupying over 100 pages of briefing and over 750 pages of exhibits. The Court highlights this dispute as particularly ridiculous: while Ms. Oviedo did not use the word "breasts" at her deposition, the Court may take judicial notice of the fact that a woman's breasts are located on her chest, meaning that someone pointing a finger close to a woman's chest is also pointing a finger close to her breasts. Useless quibbling over plainly immaterial factual characterizations has made review of this Motion needlessly cumbersome. Consistent with Rule 56, the Court has considered only the facts supported by citations to evidence that supports the factual assertion.

how are you, assholes?" on a whiteboard in the office.  [*Id.*]  Again, Ms. Oviedo ignored Correll. As Ms. Oviedo explained, "Right after, [Correll] erase it.  He wrote it.  We saw it.  He erase it because he didn't get any respond for that.  He said, Oh, well, I'm here because such and such a thing."  [*Id.*]  While Ms. Oviedo never heard Correll call a male employee "asshole" to his face, she did hear Correll refer to both male and female employees as "assholes."  As Ms. Oviedo explained, the employees Correll called "assholes" were "generally man and woman but also majority of the time womans."  [Dkt. 45-1 at 20.]

On other occasions, Correll referred to the workers in human resources as "HR bitches." [*Id.* at 50.]  Ms. Oviedo recounted one such exchange: "[Correll] called the HR bitches over there.  And I say, What?  [Correll responded,] Oh, that's true.  You are in HR, so oops.  I cannot say that.  And he say that different times."  [*Id.*]  Ms. Oviedo's account is corroborated by that of Munoz [Dkt. 45-5 at 5 (noting that Correll referred to the HR team as "bitch")], another HR generalist [Dkt. 45-4 at 5 (recalling Correll "referencing the HR bitches)], and, to some extent, by Correll himself [Dkt. 45-6 at 8 (recalling telling Munoz to "put a bitch face on")].  Gatto, director of human resources, was the only male in the human resources department at that time. Ms. Oviedo explained that Correll never specifically called Ms. Oviedo a bitch.  [Dkt. 45-1 at 19.]

During one encounter, Correll touched Ms. Oviedo's hair.  Ms. Oviedo explained that Correll entered her office, "flipped" her hair, and said "Hello."  [Dkt. 45-1 at 15.]  In response, Ms. Oviedo asked, "Why did you do that?  [Correll answered,] Oh, silly.  And he start talking to whatever we—he was—us to look in the computer, employees' hours and stuff like that."  [*Id.*] Ms. Oviedo's account is again corroborated by that of Munoz, who witnessed Correll touch Ms. Oviedo's hair [Dkt. 45-5 at 5], and Correll [Dkt. 45-6 at 9 (explaining that he brushed Ms.

Oviedo's hair out of the way so that he could see what she was trying to show him on the computer screen)]. Ms. Oviedo told Correll that she did not like the hair touching, following which Correll did not do it again.

Finally, Ms. Oviedo witnessed Correll massage Munoz's shoulders "[f]or about a minute." [Dkt. 45-1 at 17.] As Ms. Oviedo described the situation,

> Amada [Munoz] was sitting in her desk. And he went behind her and start massaging her shoulders and say, Hey, [jefa][2] . . . I need you—and I saw Amada's face start turning red and red. And I was kind of paralyzed in that situation as well. I need you to look for this by the same time he was massaging Amada shoulder. . . . And she was like, looking for—what he was telling to look on the computer . . . ."

[*Id.*] The situation made Ms. Oviedo and, according to Ms. Oviedo, Munoz uncomfortable. Munoz, however, testified that she didn't "think [Correll] did it in a mean way. I didn't feel like that. I was not upset." [Dkt. 45-5 at 5.] Ms. Oviedo could not remember the exact dates of any of these incidents.

## C. Caito's Reporting Policies

Caito has written policies prohibiting discrimination and harassment and requiring the reporting of the same. Among the relevant policies: Caito has an "Open Door Policy" allowing employees to present problems to a "supervisor for discussion" with assistance from the human resources department. [Dkt. 39-3 at 15.] If unsatisfied with the supervisor's response, the employee may escalate matters all the way up to Caito's president. If an employee is uncomfortable about speaking with a supervisor, she may send a signed or anonymous written statement to Caito's "Associate Hot-Line." [Dkt. 39-3 at 16.] Caito has an additional policy specifically addressed to "Reporting Harassment":

---

[2] The transcription shows that Correll was called "heffa" [Dkt. 45-1 at 17], which is a misspelling of the Spanish word "jefa," meaning "boss." [Dkt. 45-5 at 6.]

> Any associate who believes that he or she has been a victim of some form of workplace harassment or inappropriate or conduct from a fellow associate, including a supervisor or from a non-associate . . . should report the incident immediately to his/her supervisor, or to the Director of Human Resources.  Caito Foods <u>emphasizes that an associate is not required to complain to his/her supervisor if the associate is uncomfortable doing so.</u>  Supervisors who receive complaints or who observe inappropriate behavior will inform the Director of Human Resources immediately.

[Dkt. 93-3 at 55 (emphasis in original).]  Ms. Oviedo understood how to use these policies to report any concerns of harassment.

### D. May 14 Meeting with Frizzell

While Ms. Oviedo did not immediately (e.g., the next day) report any of her incidents involving Correll, she eventually had a meeting with Carrie Frizzell, vice president of human resources, on May 14, 2015.  At that meeting, which lasted about 35 to 45 minutes, Ms. Oviedo discussed a wide variety of concerns about Correll.  Among Ms. Oviedo's complaints were that Correll mistreated employees, pushed certain female employees harder than male employees, and engaged in the harassment described above.  Frizzell took notes during the meeting, writing, "Maria not happy—she can not speak up to Dan Correll & Feels like she can't do her job.  Dan G[atto] meet Dan C[orrell] today to discuss & Figure out how to go Forward.  Dan G will help. Need to handle people issues differently."  [Dkt. 45-2 at 55.]

At her deposition, Frizzell did not recall Ms. Oviedo mentioning any specific situations and denied hearing about the instances of harassment at their meeting.  Frizzell explained that Ms. Oviedo stated that Correll was "difficult to work with, he was demanding, using the walkie-talkies to call people to come see him.  Once again, describing those people issues he had with not only Maria but production supervisors, both male and female."  [*Id.* at 10.]  Frizzell explained that she spoke to Correll's boss about Ms. Oviedo's comments, saying, without "naming any names, that we needed to talk about the people issues related to Dan Correll."  [Dkt.

45-2 at 11.]  Frizzell also spoke with Gatto "about making sure we clearly articulate [Ms. Oviedo's] objectives to her so that she can stay focused and prioritize what she needs to get done."  [*Id.*]  On another occasion, a male employee named Marcos Gutierrez complained to Frizzell that Correll was "extremely difficult to work with."  [Dkt. 45-2 at 11.]

### E.  Aftermath of Frizzell Meeting

Approximately a week or two after Ms. Oviedo's conversation with Frizzell, Correll called Ms. Oviedo and two FreshLine production managers to speak with him in his office. Correll asked, "Who went to HR and say, this, this, this?"  [Dkt. 45-1 at 11.]  Correll first asked Jorge, one of the FreshLine managers, "Did you went to HR and you spoke and say that mistreating employees, that this, this, this happen?  Jorge say, No, sir.  [Correll said,] Marcos, [a FreshLine manager,] you did.  [Marcos responded,] No sir.  [Correll said,] Maria, you did.  I was terrified and I lie.  I say, No, I did not."  [*Id.*]

Correll admitted that this conversation occurred, stating that he called the three in to address "rumblings and scuttlebutt" that he thought

> we should be able to discuss among our group.  That's why I had Maria there.
> My assumption was it was one of those two production managers, and I wanted to
> make sure that they were being brought—with Maria's presence that they brought
> those things to our attention . . . and we might be able to resolve the issues.

[Dkt. 45-6 at 11.]  Correll believed that he heard about the "rumblings and scuttlebutt" from "supervisors that were coming to me saying there was problems or maybe there wasn't problems."  [*Id.*]

At some point either shortly before or after the meeting between Correll, Ms. Oviedo, and the FreshLine production managers, Correll went to Ms. Oviedo's office and said, "Do you have any tissues?  And [Ms. Oviedo] said, what you need?  I give few.  [Correll] said, No, I need a box, two boxes.  I going to make some people to cry today."  [Dkt. 45-1 at 42.]  Correll likewise

recalls making a comment at some point about needing a tissue box for people who could start crying.  [Dkt. 45-6 at 13.]  Based upon the meeting and Correll's comment, both of which closely followed her meeting with Frizzell, Ms. Oviedo feared that Correll had learned of her complaints of harassment.

Following these incidents, Correll reassigned Ms. Oviedo's assistant, Munoz, to report to Marcos Gutierrez and work with the FreshLine production supervisors.[3]  [Dkt. 45-6 at 8.] Munoz had previously reported to Gutierrez prior to reporting to Ms. Oviedo.  Munoz's transfer left Ms. Oviedo with an increased workload and additional pressure to meet deadlines.  Ms. Oviedo did not receive another assistant following Munoz's transfer.

**F. Performance**

**1. May 12 Review**

Caito uses a four-category review system for performance reviews: 1-Below Average, 2-Average, 3-Above Average, 4-Exceptional.  On May 12, 2015, two days before her conversation with Frizzell about Correll, Ms. Oviedo received a formal performance review from Gatto with an overall rating of Above Average.  She received Exceptional ratings in two categories, Above Average in eight, Average in two, and no Below Average ratings.  Gatto provided comments on how Ms. Oviedo could improve in each of the Average categories.  For example, in "Develop Talent," Ms. Oviedo received an Average rating and received recommendations to "Create a written process for all training; SOP's [Standard Operating Procedures (SOP)]."  [Dkt. 29-3 at 69.]  Ms. Oviedo also received an Average rating in "Dependable," and was directed to "work on

---

[3] Caito disagrees with Ms. Oviedo's timeline, citing to evidence that either the decision to reassign Munoz or her actual reassignment occurred in April, before Ms. Oviedo's meeting with Frizzell in May.  [Dkt. 48 at 15 (citing, for example, Dkt. 45-2 at 38 (Frizzell's handwritten notes on Munoz's reassignment dated April 15, 2015)).]  But Ms. Oviedo clearly testified that Correll reassigned Munoz in the aftermath of Ms. Oviedo's discussion with Frizzell [*e.g.*, Dkt. 45-1 at 11], and it is Ms. Oviedo's account, as the nonmovant, that the Court must credit on summary judgment.

getting to meetings on time and returning phone calls and emails in a timely matter." [Dkt. 29-3 at 71.] Ms. Oviedo responded to the comment on July 1, stating

> It's difficult to be on time when I'm the only one person to take care around 600 employees, 5 different agencies to work with it, 100 email per days, plus all the other situation that may arise during the day. I'm open to hear any suggestion on how I can improve this matter.

[*Id.*] For the next evaluation period, Ms. Oviedo was asked to "Create an SOP for training processes/procedures" and "Develop a continuing education program to make our supervisors better at their jobs," among other things. [Dkt. 29-3 at 79.] Gatto concluded the evaluation with a final comment, "Glad to have you as part of the HR team!" [Dkt. 29-3 at 80.] Gatto believed that, as of May 12, Maria was meeting performance expectations.

### 2. May 14 and 28 Meetings Regarding Open CSR Positions

On May 14, before Ms. Oviedo's one-on-one meeting with Frizzell about Correll, Frizzell and another HR generalist met with Ms. Oviedo about filling a vacant customer service representative (CSR) position. The previous CSR had resigned on May 1, effective May 14. After a discussion with Frizzell and the other HR generalist, Ms. Oviedo agreed to handle filling the position, which needed to be resolved in a "very tight time crunch." [Dkt. 45-2 at 10.] As of June 3, Ms. Oviedo had still not filled the position, so the other HR generalist "made an offer . . . with a candidate she sent to [Ms. Oviedo] before [the previous CSR] even left." [Dkt. 39-2 at 23.] Caito filled the position with a temporary worker. Ms. Oviedo explained that she could not

> pursue [filling the position] totally because Armand [Angeles, a manager,] and Dan Correll said to me, Maria, let's hold that to be—publish it, like, outside Caito and see if we can find [a hiring] agency candidate. . . . So they told me to do that. . . . I didn't pursue—continue looking for people because Armand and Dan Correll ask me for the agency to bring those people they want to interview first . . . .

[Dkt. 45-1 at 70.] Ms. Oviedo said that she interviewed a few applicants but admits that the position was still open on June 3. Ms. Oviedo did not mention to the other HR generalist

involved that the delay resulted from awaiting an agency candidate.  She believed that she may have said something to Frizzell [Dkt. 45-1], though Frizzell maintains that Ms. Oviedo never mentioned that the delay was due to a decision to pursue an agency candidate.

On May 28, Frizzell met with Ms. Oviedo.  According to Frizzell's email to Correll and Gatto about the meeting, Frizzell and Ms. Oviedo discussed Ms. Oviedo's "struggle to get people in during our busy season" and reminded Ms. Oviedo "of the multiple conversation we have had with her since she got her[e] on bringing in people for our busy time!!!"  [Dkt. 39-2 at 11.]  Frizzell forwarded a job description that Ms. Oviedo had created at Gatto's request, adding that "[i]f Ms. Oviedo can't accomplish these tasks we need to begin having performance conversations with her."  [*Id.*]

### 3.  May 30 Careers in Food Job Posting Request

On May 30, Jeff Nassif, a manager in quality assurance, emailed Ms. Oviedo to ask her to post two open positions on a job website called "Careers in Food."  [Dkt. 39-2 at 30.]  Ms. Oviedo understood that Nassif's request was a priority.  Posting such a position takes about 20 minutes to complete.  But sometime after May 30, Ms. Oviedo visited the Careers in Food website and discovered that Caito's account had expired.  Ms. Oviedo went to Angeles and Correll and orally told them that the account was expired.  Ms. Oviedo then waited for instructions about whether to proceed with reopening the account (which would require a company credit card) or to proceed otherwise.  Correll told Ms. Oviedo, "Let's wait because if we're going to bring people from California or with this agency, let's see what we can do." [Dkt. 45-1 at 72.]

While Ms. Oviedo orally told Nassif at some point that she was waiting, she did not follow up with him over email or talk to Gatto about the issue.  Ms. Oviedo testified at her

deposition that it was a "mistake" not to bring the account expiration to Gatto's attention. [Dkt. 45-1 at 73.] Instead, on June 8 at 11:05 a.m., Nassif emailed Ms. Oviedo, "Please confirm that these have been posted." [Dkt. 39-2 at 29.] The next morning, Angeles emailed Ms. Oviedo, "Maria—Have you responded??" [*Id.*] Ms. Oviedo responded to Angeles, "[I]n order to posted this position we need to register again, because our registration has been expired. Below are all the option. Please let me know which one you would like to use it." [*Id.* at 28.] Angeles forwarded Ms. Oviedo's email to Frizzell on June 17, writing, "I want to move forward posting some QA positions here, however, who do you want to have this account." [*Id.*]

**4.  June 1 Performance Complaints to Gatto**

Gatto noticed a drop in Ms. Oviedo's performance on June 1, 2015. Gatto had received complaints from three managers, Nassif, Angeles, and Correll, "about [Ms. Oviedo's] lack of follow-through." [Dkt. 39-7 at 12.] Both Nassif and Angeles complained about the time it took Ms. Oviedo to fill vacant positions. Correll complained that Ms. Oviedo had a "lack of organization, getting people in." [Dkt. 45-3 at 8.]

**5.  June 4 Request to Create SOP & Discussions with Frizzell and Gatto**

On June 4, Gatto and Frizzell met with Ms. Oviedo to discuss "her lack of initiative and urgency with the CSR openings." [Dkt. 39-9 at 8.] Frizzell's notes suggested that Gatto and Correll "need to address performance issues [with Ms. Oviedo], set clear expectations, because things are not getting done." [*Id.*] Frizzell wrote, "This industry is demanding and fast paced. May be too much for [Ms. Oviedo.] She needs to step it up." [*Id.*] At the meeting, Frizzell and Gatto discussed with Ms. Oviedo her need to create SOPs, to work with employment agencies, and to create a training matrix. They also told Ms. Oviedo that the time it took to fill the CSR position was unacceptable. Frizzell emailed an outline for an SOP to Ms. Oviedo, which, when

11

completed, would detail procedures for dealing with temporary employees placed by agencies.

[Dkt. 39-9 at 11.]

On June 6, Frizzell followed up with an email to Ms. Oviedo (with copies to Gatto and Correll), again explaining Ms. Oviedo's areas of responsibility and explaining that the "time to fill the CSR position in FreshLine was not acceptable.  Please make sure you review the above responsibilities and let Dan or I know if there are areas you need help with."  [Dkt. 39-2 at 26.] Frizzell wrote,

> HR needs to be available to respond to the business needs of the operations and be flexible when change occurs (which is quite often in our industry).  Prioritizing your work needs to be done on a daily basis in order to achieve your goals and support the business.  We will meet again next week to go over this and answer any questions you may have.

[*Id.*]  At no point did Ms. Oviedo reach out to Frizzell or Gatto for help.

On June 8, Frizzell again emailed Ms. Oviedo the SOP outline, asking Ms. Oviedo to "please get with Armand [Angeles] and Dan [Gatto] to get their feedback."  [Dkt. 45-2 at 63.] Frizzell testified that she believed seven days would have been a "reasonable" time for Ms. Oviedo to complete the SOP [Dkt. 45-2 at 15], though at no point did Frizzell give Ms. Oviedo a specific deadline to complete the SOP.

On June 18, Frizzell again emailed Ms. Oviedo:

> Maria, I met with Nora and Amada [Munoz] to discuss the issue Amada has been having with temps starting work before they are entered into the system.  This is causing Amada to have to manually enter times for the temps for the first few days.
> We all agreed the best way to ensure this does not continue to happen is to follow the SOP we created a couple weeks ago. . . .
> Were you able to talk to Armand [Angeles] or Dan [Gatto] about this?

[Dkt. 45-2 at 63.]

On June 24, Ms. Oviedo responded, "I will have a meeting tomorrow with Armand, Dan and Amada.  Just to have everyone on the same page."  [*Id.*]  Ms. Oviedo followed up again on June 25 and 26, explaining that she had circulated changes to the SOP and was waiting final approval.  On June 30, Ms. Oviedo sent a final SOP draft to Frizzell, Gatto, Junkins, and Munoz, asking them to review the SOP and to have a meeting to explain the new procedures to those affected.

### 6. June 26 Gate Cards Incident

On June 26, Caito terminated two agency-placed temporary employees from Morales Group.  That day, Ms. Oviedo emailed Morales Group to tell them that the employees were terminated.  Ms. Oviedo did not require the workers to return their gate cards.  Thus, on June 27 and 29, the terminated employees returned to work, in violation of Caito's policies.  Another employee's assignment ended on June 29, and his gate card also was not collected.  Caito is required to maintain accurate logs of all persons on the premises.

On June 30, Ms. Oviedo emailed Morales Group and Correll that the workers had entered Caito without authorization.  Correll replied, "Why did you [Ms. Oviedo] not have him brought back to your office and forwarded to his agency?  Then his gate card would have been collected. Seems that would have been the appropriate action.  This is unacceptable . . . ."  Correll communicated his concerns to Frizzell.  Frizzell believed that the situation would have been avoided had Ms. Oviedo timely completed the SOP for dealing with temporary employees.

At her deposition, Ms. Oviedo explained that she was not responsible for collecting gate cards.  Morales Group employees emailed Ms. Oviedo accepting responsibility for the mishap and explaining that they were unable to reach the overstaying temporary employees.  In the future, Morales Group committed to having representatives onsite to deal with terminated

13

temporary employees if they could not be reached.  Caito did not reference the gate cards issue in its response to the EEOC investigation, but instead primarily relied upon Ms. Oviedo's delay in filling the CSR position and general performance deficiencies to justify her termination.

### 7. June 30 "Records of Occurrence"

On June 30, Frizzell created two "Record of Occurrence" incident report forms due to Ms. Oviedo's performance issues.  One dealt with Ms. Oviedo's delay in filling the CSR position (*supra* II.F.2), the other addressed Ms. Oviedo's delay in completing the SOP (*supra* II.F.5). Both had a "Date of Incident" of June 24.  Neither was shown to Ms. Oviedo.

### G. Thiebaud Interview

On June 16, Angeles received a resume for Jorge Thiebaud.  [Dkt. 49-2 at 17.]   On June 23, Ms. Oviedo contacted Thiebaud with information regarding the interview.  [Dkt. 45-8 at 19-20.] On June 24, Angeles interviewed Jorge Thiebaud as a candidate for a FreshLine manager position.  Following the interview, Angeles emailed Frizzell, "I want to talk to you about this person when you have a moment," believing that Thiebaud would be a good HR candidate. [Dkt. 49-2 at 17.]  On June 30, Frizzell and others interview Thiebaud for an HR position. Thiebaud was offered an HR position on July 2, and took Ms. Oviedo's position on July 13. Once Thiebaud began working for Caito, the HR department had 12 females and two males.

### H. Termination

On July 7, Gatto and Frizzell met with Ms. Oviedo to inform her that they were terminating her due to her performance issues.  Frizzell attended as a witness.  Correll did not recommend Ms. Oviedo's termination nor was involved in Gatto's termination decision.  Ms. Oviedo was offered a $2,000 severance package in exchange for waiving her rights to any Title VII suit, but she declined the offer.  Her termination date was eventually changed to July 10.

14

Ms. Oviedo thereafter filed an EEOC charge and, after being issued a Right to Sue letter, a Complaint in this Court, alleging harassment, sex discrimination, and retaliation.

### III.  Discussion

The Court addresses harassment first followed by Ms. Oviedo's sex discrimination and retaliation claims, which follow an identical framework following the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

### A.  Harassment

Caito argues that Ms. Oviedo has failed to identify genuine issues of material fact as to any of the four elements required for a harassment claim.  A harassment, or hostile work environment, claim requires the plaintiff to establish that "(1) she endured unwelcome sexual harassment; (2) she was harassed because of her sex; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile work environment; and (4) there is a basis for employer liability."  *Nischan v. Stratosphere Quality, LLC*, No. 16-3464, 2017 WL 3275149, at *3 (7th Cir. Aug. 2, 2017) (citing *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684 (7th Cir. 2010)).

Whether harassing conduct is sufficiently severe or pervasive "depends on the totality of the circumstances including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Worth v. Tyler*, 276 F.3d 249, 267 (7th Cir. 2001).  "Not all offensive conduct violates federal law"; merely vulgar behavior is not actionable, while abusive behavior is.  *Patton v. Keystone RV Co.*, 455 F.3d 812, 815 (7th Cir. 2006).  But

> [d]rawing the line [between vulgar behavior and sexually harassing behavior] is not always easy. On one side lie sexual assaults; other physical contact, whether

amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Id.* (emphasis omitted) (second alteration in original) (quoting *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430-31 (7th Cir. 1995)).

Limited contact with nonintimate areas of a person's body are

insufficient in isolation to constitute a hostile environment. *See, e.g., McPherson v. City of Waukegan,* 379 F.3d 430, 434, 439 (7th Cir. 2004) (fact of supervisor pulling back plaintiff's shirt once to see the type of bra she was wearing insufficient); *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 459, 463-64 (7th Cir. 2002) (supervisor's rubbing of back and shoulders, which ceased after plaintiff complained); *Adusumilli v. City of Chicago,* 164 F.3d 353, 361-62 (7th Cir. 1998) ("four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks"); *Koelsch v. Beltone Elecs. Corp.,* 46 F.3d 705, 706-08 (7th Cir. 1995) (one instance where supervisor rubbed foot against plaintiff's leg and another where he grabbed plaintiff's buttocks); *Weiss v. Coca-Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir. 1993) (assuming, despite contradictory deposition testimony, that two attempts by a supervisor to kiss the plaintiff were insufficient).

*Id.* at 817. Such contact is all the more unlikely to create a hostile environment where it stops after the employee complains. *See id.* at 816 ("Casual contact that might be expected among friends—'[a] hand on the shoulder, a brief hug, or a peck on the cheek'—would normally be unlikely to create a hostile environment in the absence of aggravating circumstances such as continued contact after an objection." (quoting *Baskerville,* 50 F.3d at 430)).

No reasonable juror could find Correll's conduct objectively severe and pervasive as that term is understood. While inappropriate and undignified, Correll's finger gesture, hair flip, massage of Ms. Oviedo's assistant, and crude language simply are not the stuff of employment-changing behavior. Moreover, as Ms. Oviedo testified, Correll stopped the behaviors each time Ms. Oviedo asked Correll to stop. Thus, the Court should **GRANT** Defendant's Motion as to Ms. Oviedo's harassment claim.

16

**B. Sex Discrimination & Retaliation**

*Ortiz*, 834 F.3d 760, changed the landscape for employment discrimination cases. In one fell swoop, the Seventh Circuit cleared the morass of legal tests and replaced it with a straightforward inquiry: Has the plaintiff proffered sufficient evidence for a reasonable juror to find that the employer took an adverse action against the employee for an impermissible reason? *Id.* at 765 ("That legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the . . . proscribed factor caused the discharge or other adverse employment action. . . . [N]o evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'"); *Lauth v. Covance, Inc.*, No. 16-2939, 2017 WL 2979868, at *7 (7th Cir. July 13, 2017) ("As with the discrimination claim, we no longer recognize a distinction between direct or indirect evidence [in retaliation claim], and instead consider all of the record evidence to determine whether a causal link [between protected activity and adverse action] exists."); *Nicholson v. City of Peoria, Ill.*, 860 F.3d 520, 523 (7th Cir. 2017) ("After *Ortiz*, this court has entirely done away with the distinction between 'direct' and 'indirect' evidence and methods of proof . . . ."). *But cf. David v. Bd. Of Trustees of Comty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (noting that, post-*Ortiz*, the *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973), framework remains "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases").

Ms. Oviedo relies, in part, upon the familiar burden-shifting framework to demonstrate a triable issue of fact as to her claims. To succeed under such a framework, she must show (1) that she is a member of a protected class (either of her gender or as a harassment complainant); (2) that she met Caito's legitimate expectations; (3) that she suffered an adverse employment action;

and (4) that similarly situated employees outside of her class received favorable treatment. *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F,3d 599-600 (7th Cir. 2010). Should Ms. Oviedo satisfy these requirements, Caito must demonstrate a legitimate, nondiscriminatory reason for its action, following which Ms. Oviedo would be tasked with showing that Caito's reasons were pretextual. *Id.* at 600. But behind all of this lurks the guidance of *Ortiz*, and the dispositive question of whether a reasonable juror could find that Ms. Oviedo was terminated for an impermissible reason.

### 1. Discrimination

Caito launches a barrage of arguments as to why both of Ms. Oviedo's remaining claims must fail. Ms. Oviedo's sex discrimination claim may be swiftly dealt with, as she has failed to show that Caito's decision to terminate her are tainted with pretext or otherwise linked to her sex. *Cf. Lauth*, 2017 WL 2979868, at *5 (proceeding directly to issue of satisfaction with plaintiff's performance and pretext).

The undisputed evidence demonstrates that Gatto, Ms. Oviedo's supervisor, made the decision to terminate Ms. Oviedo with an honest belief that Ms. Oviedo was not performing her job adequately. Gatto made the decision after receiving complaints from Nassif and Angeles and having numerous conversations with Frizzell, among others, about Ms. Oviedo's lack of follow-through and unresponsiveness to work emails.[4] Gatto's honest belief is confirmed by contemporaneous emails between him and Frizzell, expressing concerns with Ms. Oviedo's performance.

---

[4] Any inference that Correll, assuming (without deciding) that he housed discriminatory intent in complaining about Ms. Oviedo, had a meaningful role in Ms. Oviedo's termination is negated by the fact that several other employees likewise complained about Ms. Oviedo's performance and by the undisputed evidence that Gatto (the decision maker) and Frizzell held consistent concerns about Ms. Oviedo's performance.

18

Ms. Oviedo places much emphasis on her positive May 12 review as evidence that she met expectations just over a month prior to her termination. But even the May 12 review expressed concerns with Ms. Oviedo's timeliness and follow-through, and apparently these concerns grew to the point where Gatto decided that he needed to terminate Ms. Oviedo. *Cf., e.g.*, *Naik*, 627 F.3d at 600 ("Naik's response is that he had met BIPI's legitimate expectations in the past. This, however, is irrelevant. Naik must show that he was meeting BIPI's expectations at the time of his termination . . . ."). That the concerns expressed in the May 12 review ultimately became the basis for Ms. Oviedo's termination weighs against an inference of discriminatory intent, not in favor of it. *See, e.g.*, *Lauth*, 2017 WL 2979868, at *6 ("Lauth makes much of the fact that he received a 'Meets Expectations' rating, or better, on all of his year-end [reviews]. In each of those [reviews], however, Lauth's communication was described as an issue that he needed to remedy.").

Ms. Oviedo criticizes the decision to terminate her on several additional grounds. Among these: Ms. Oviedo contends that she was meeting Caito's expectations because she reasonably acted to fill the CSR positions, quickly created the SOP as asked,[5] and lacked the authority to collect the temporary workers' gate cards.[6] On each of these points, Ms. Oviedo's arguments "are that h[er] supervisor['s] concerns were misplaced and that those who complained

---

[5] Here, Ms. Oviedo overlooks the fact that assuming, as the Court must, that she created the SOP the day after being asked, she does not challenge the evidence showing that she did not send it to anyone for over a week after completing it.

[6] And here, Ms. Oviedo overlooks the fact that even if she lacked the authority to personally collect the gate cards, Frizzell's primary complaint was that the entire situation could have been avoided had Ms. Oviedo timely sent and implemented the requested SOP. Ms. Oviedo's contention that Caito first criticized her for the gate card incident "seventeen months after Ms. Oviedo's termination" [Dkt. 44 at 33] is wholly belied by the record. To the contrary, contemporaneous emails demonstrate that at least Correll was concerned by the incident. Additionally, no inference of pretext or discrimination may be drawn from Thiebaud's June 20 interview, as the undisputed contemporaneous electronic evidence confirms that he was first interviewed by Angeles for a FreshLine position and later referred to Frizzell for consideration for an HR position.

about h[er] did not have a basis to do so." *Id.*  But "[t]he question is not whether [Caito's] stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain its decision." *Simpson v. Beaver Dam Cmty. Hosp., Inc.*, 780 F.3d 784, 795 (7th Cir. 2015).  Ms. Oviedo has offered no evidence to suggest that Gatto did not honestly believe that Ms. Oviedo's performance was insufficient.  Ms. Oviedo also asks the Court to infer that the Records of Occurrence that Frizzell created but did not show Ms. Oviedo were an "after-the-fact paper trail" and thus created to cover up invidious discriminatory intent.  But without **any** evidence to support such a claim (e.g., metadata from the files), no reasonable juror could draw such a specious inference.

Finally, the exclusion of the gate cards incident from Caito's response to the EEOC charge does not establish that Caito has relied upon "shifting" or "inconsistent" explanations for terminating Ms. Oviedo.  This is because

> [a] company's "failure to address *all* of the reasons in *each* communication about the employee is not enough to show contradictions or shifts in rationales that suggest pretext. See *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733–34 (7th Cir. 2001) (employer's supplementation of reasons for adverse employment decision not evidence of pretext so long as reasons do not conflict and employer does not retract a reason); *O'Connor v. DePaul University*, 123 F.3d 665, 671 (7th Cir. 1997) (employer's "flux in terminology" not evidence of pretext where three explanations "focused on different aspects of [employee's] behavior" but same underlying conduct).

*Castro v. DeVry Univ.*, 786 F.3d 559, 577 (7th Cir. 2015) (emphasis in original).  Caito's position all along has been that it terminated Ms. Oviedo for lack of follow-through and poor communication.  It is permitted to supplement its reasons with additional incidents that are consistent with its prior explanation.  That is precisely what has happened here.

"Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus."

*Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016).  Based on this record, no reasonable juror could find that Ms. Oviedo was terminated because of her gender.  Accordingly, the District Judge should **GRANT** Caito's Motion as to Ms. Oviedo's gender discrimination claim.

### 2.  Retaliation

Ms. Oviedo's retaliation claim, however, stands on different footing.  To survive summary judgment on a retaliation claim, a plaintiff must offer evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two."  *Baines v. Walgreen Co.*, No. 16-3335, 2017 WL 2962887, at *3 (7th Cir. July 12, 2017).  Caito challenges each of these elements, but Ms. Oviedo has provided enough evidence to warrant a jury determination as to whether Caito retaliated against Ms. Oviedo for her complaint about Correll's harassment.

### i.    Statutorily Protected Activity

First, Caito argues that Ms. Oviedo's complaint to Frizzell about Correll did not constitute a statutorily protected activity because her complaints were too general, addressing Correll's management style but failing to raise the alleged sexual harassment.  In support, Caito cites to quotes from Ms. Oviedo's deposition testimony describing her May 14 meeting with Frizzell.

As Caito explains, "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  The employee must "at least say something" to indicate that harassment is an

issue for a complaint to constitute protected activity. *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 815 (7th Cir. 2011).

Reaching Caito's conclusion, however, would require the Court to flaunt Rule 56 and draw inferences in Caito's favor instead of in Ms. Oviedo's. Consider, for example, the following exchanges from Ms. Oviedo's deposition:

> A  And when is the very first time that you complained about that particular [hand gesture] incident to anyone at Caito?
> A  **When I spoke with Carrie [Frizzell]. I kind of went through all my experience.**
> Q  **Even those that had happened previously?**
> A  **Yes.**

[Dkt. 45-1 at 13 (emphasis added).]

> A  The chin thing and I stop him and I said. Don't do it again, so—and he flip my hair. And when I saw that he flip my hair and I saw Amada face of uncomfortable, yes, that's—
> Q  But you didn't report those. Did you think that there wasn't a policy suggesting that you had an obligation to report that?
> A  Yes. I mean, I have to report it, **which I did**, but not by writing. I reported my—**verbally in a meeting with Carrie.**
> . . .
> A  But I—**I had report that. I told her that.**

[Dkt. 45-1 at 37 (emphasis added).]

> Q  But do you remember the list of instances [of harassment] you told [Frizzell] about?
> A  Yes.
> Q  And what was that list?
> A  **The list you asked me before.**

[Dkt. 45-1 at 53 (emphasis added).]

A juror may well consider this testimony and conclude that Ms. Oviedo complained about Correll's harassing behavior. Or a juror might agree with Caito that Ms. Oviedo's complaints were just general workplace gripes, as evinced by Frizzell's notes from the meeting and by other portions of Ms. Oviedo's testimony. But the exchanges quoted above suffice to

create a genuine issue of material fact as to whether Ms. Oviedo engaged in statutorily protected activity by complaining about harassment.

### ii.    Materially Adverse Action

Second, Caito argues that the reassignment of the portion of Amada Munoz's workload dedicated to Ms. Oviedo to another employee was not an adverse action as that term is used in Title VII.  "In the retaliation context, conduct is 'materially adverse' if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006)).  Unlike in a discrimination claim, adverse actions in a retaliation case "are not limited to those that affect the terms and conditions of one's employment." *Alamo v. Bliss*, No. 15-2849, 2017 WL 3084145, at *8 n.39 (7th Cir. July 20, 2017) (quoting *Henry v. Milwaukee Cnty.*, 589 F.3d 573, 586 (7th Cir. 2003)).  Whether an action reaches the level of materially adverse "all depends on how much of a change, and how disadvantageous a change, took place." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003).  Actions that change an employee's job "in a way that injure[ her] career," *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002), or "ma[k]e it difficult for [the plaintiff] to perform [her] job at the same level," *Alamo*, 2017 WL 3084145, at *7, may meet this standard, though the action must be "significant," *Henry*, 589 F.3d at 586.  An increased workload may be "significant" if it causes an employee to "work extra hours," "suffer a[] loss of pay," or be "disciplined for failing to complete her work," recognizing that mere performance criticism is "not actionable unless [it is] accompanied by tangible job consequences." *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008).

A reasonable jury could find that reassignment of 20 percent of Munoz's job tasks (equivalent to one day per week) from Ms. Oviedo to another manager would dissuade a reasonable worker from making a complaint of harassment.[7] When Correll told Ms. Oviedo that Munoz was being reassigned, she told Correll that she needed Munoz's help. Without Munoz's help, Ms. Oviedo's workload increased, following which she received increased criticism for failing to timely follow through and communicate, which ultimately led to her termination. While the Seventh Circuit in *Lapka* affirmed summary judgment where the plaintiff complained of an increased workload, it held that the increase was not significant enough in light of the absence of discipline for failure to complete work. Here, Ms. Oviedo received the ultimate discipline—termination—for such failure. A jury thus must determine whether the reassignment of Munoz constitutes a "significant" change such that it might dissuade an employee from protected activity.

### iii.     Causal Connection

Finally, Caito argues that Ms. Oviedo cannot establish a causal connection between Ms. Oviedo's complaint to Frizzell and Munoz's reassignment. Caito argues that Correll had no knowledge of Ms. Oviedo's complaint to Frizzell and thus could not have retaliated for her report. Caito also argues that the timeline does not yield a reasonable inference of causation based upon Frizzell's notes that Munoz was reassigned a month prior to Ms. Oviedo's complaint to Frizzell.

---

[7] Caito cites, *inter alia*, to the supplemental declaration of Frizzell to support its argument, wherein Frizzell averred that "[a]t the time of her hire, Ms. Oviedo was not assigned an assistant. HR Generalists at Caito are not typically assigned assistants." [Dkt. 49-2 at 6.] Whether HR Generalists are "typically" assigned assistants is beside the point, and Ms. Oviedo testified that Munoz was her assistant from the time she began at Caito until Munoz's transfer in May. The Court may not resolve this discrepancy on summary judgment.

Again, taking Caito's position would require the Court to flaunt the Rule 56 requirement that Ms. Oviedo benefit from all reasonable inferences in her favor. Ms. Oviedo's testimony that Munoz was transferred **after** her complaint regarding Correll's behavior is sufficient to demonstrate a genuine issue of material fact with regard to Caito's argument that Munoz was reassigned prior to Ms. Oviedo's complaint. The Court further concludes that the following facts yield a reasonable inference of causation:

- Frizzell spoke with Gatto and Correll's boss regarding Ms. Oviedo's complaints, though Frizzell testified that she did not "name names."

- Just a few days after Ms. Oviedo's complaints, Correll rounded up Ms. Oviedo and two managers and quizzed them on who complained to human resources.

- Also close in time to the questioning, Correll remarked to Ms. Oviedo about how he would need tissues because he was going to make people cry.

- Finally, immediately following each of these, Correll transferred Munoz from Ms. Oviedo.

Caito maintains that the inference that Correll knew about Ms. Oviedo's harassment complaint is unreasonable because Frizzell testified that she did not tell Correll about it and Correll testified that he did not know about it. Notwithstanding that testimony, Correll's meeting with Ms. Oviedo and the two managers to quiz them regarding a human resources complaint is sufficient evidence from which a juror could reasonably infer that Correll knew of a harassment complaint and believed that at least one of the individuals in the meeting, including Ms. Oviedo, was the source of the complaint. Most critically, a reasonable juror could evaluate the foregoing and conclude not only that Correll knew about Ms. Oveido's complaint, but also transferred Ms.

Oviedo's assistant in retaliation for making the complaint.[8]  A trial is required to resolve these issues.  The Court should therefore **DENY** Caito's Motion as to Ms. Oviedo's retaliation claim.

## IV.  Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the District Judge **GRANT** Caito's Motion as to Ms. Oviedo's hostile work environment and gender discrimination claims and **DENY** Caito's Motion as to Ms. Oviedo's retaliation claim.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated:  8 AUG 2017

_____

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the court's ECF system.

---

[8] Whether Ms. Oviedo can actually link the transfer of her assistant to the poor performance that led to her termination is likewise an issue of fact to be resolved at trial.  *Cf., e.g.*, *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) (noting that Title VII imposes employer liability where actions of nonsupervisor "intentionally helped cause the adverse employment action" against the plaintiff); *Herrnreiter*, 315 F.3d at 746 (noting that adverse action short of termination may result in liability for termination if plaintiff can show that she was "'set up' . . . to fail").